**United States District Court – District of Columbia**

**333 Constitution Avenue, N.W.**

**Washington, DC 20001**

**Room 1225**

| | |
|---|---|
| 1. Mr. Wodajeneh Cherinet | ) |
| Plaintiff | ) |
| -V- | ) |
| 1. Administrative Office of the United States | ) |
| Courts | ) |
| 2. Mr. Roy Varghese | ) |
| 3. Ms. Vijayalakshumi Balasubramian | ) |
| Defendants | ) |

Case: 1:24−cv−01138
Assigned To : McFadden, Trevor N.
Assign. Date : 4/19/2024
Description: Employ. Discrim. (H−DECK)

Jury Trial (No)

## COMPLIANT FOR EMPLOYMENT DISCRIMINATION AND RETALIATION

1. **The Parties to this Compliant**

1.1. **The Plaintiff**

1.1.1. Wodajeneh Cherinet

7115 Battle Field Loop,

Brandywine MD 20613

Email: - wodajeneh_cherinet@yahoo.com

Cell: - 2028191692

1.2. **The Defendants**

1.2.1. Administrative Office of the United States Courts (AO US Courts)

1 Columbus Circle Northeast,

RECEIVED

APR 1 9 2024

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Washington, DC 20002

Cell: - (202) 502-2600

1.2.2.    Mr. Roy Varghese

6514 River Clyde Drive,

Highland, MD 20777

(301) 655-0160

1.2.3.    Ms. Vijayalakshumi Balasubramian

22526 Scattersville Gap Ter,

Ashburn, VA 20148-3173

Email: - viju_balasubramanian@ao.uscourts.gov

Cell: - (202) 322-1363, (703) 772-5448

## 2.    Place of Employment

2.1.    Administrative Office of the United States Courts (AO US Courts)

1 Columbus Circle Northeast,

Washington, DC 20002

Cell: - (202) 502-2600

## 3.    Base for Jurisdiction (Applicable Laws)

3.1.    **Title VII of the Civil Rights Act of 1964 prohibits employment** discrimination based

on race, color, religion, sex, and national origin. It also prohibits retaliation against

individuals like me who oppose unlawful discrimination.

3.2.    The Age Discrimination in Employment Act of 1967 protects workers 40 years or older

from age discrimination.

3.3.    The Civil Rights Act of 1991 allows jury trials and compensatory and punitive damages

in cases of intentional discrimination.

3.4.  Chapter 3: Workplace Conduct and Protections AO Manual establishes a personnel system prohibiting discrimination.

3.5.  Chapter 4: Recruitment and Employment of the AO Manual provides policy guidance for recruitment and employment.

3.6.  Fair Employment Practices under the AO Personnel Act of 1990, which establishes anti-discrimination policies and procedures.

3.7.  Article §1420 (e) of the AO Manual prohibits discrimination based on the following factors: race, color, religion, age (age 40 or older), sex (including pregnancy, gender identity, and sexual orientation), national origin, marital status, and disability.

3.8.  The EEOC laws prohibit punishing job applicants or employees for asserting their rights to be free from employment discrimination, including harassment.

4.  **Statement of Claim**

4.1.  **Background**

4.1.1.  **About Myself**

4.1.1.1. My name is Wodajeneh Cherinet, a 69-year-old individual, a resident of Maryland *(See Exhibit 1.1 WC Copy of Driving License Attesting My Age as a Protected Class)*, a husband married to Ms. Meaza Lulseged, and a father of one daughter, Ms. Ruth Lulseged Wodajeneh, *(See Exhibit 1.3 WC Copy of the Birth Certificate of My Daughter)*.

4.1.1.2. In 1995, I became a naturalized citizen of the United States of America *(See Exhibit 1.2 WC Copy of Naturalization Attesting My National Origin as a Protected Class)*. Throughout my lifetime, I have unreservedly respected and abiding by the law.

4.1.1.3.I frequently find solace in the company of books cherished and nestled close to my heart. These literary companions have consistently stood by me, serving as unwavering guides on my journey to amplify my career and hone my expertise in the dynamic and ever-evolving realm of technology.

4.1.1.4.After completing my undergraduate studies in Mathematics at Addis Ababa University (*Exhibit 4.1 WC Copy of my Bachelor of Science in Mathematics from Addis Ababa University, August 1980*), in my home country, Ethiopia, where I served in various Ministerial Offices for about six years.

4.1.1.5.In 1986, I received the opportunity to pursue my master's degree in Computer Science at Syracuse University, Syracuse, NY. Following this grant, I traveled to the USA to continue my education. I graduated in 1989 (See *Exhibit 4.2 WC Copy of my Master of Science in Computer Science from Syracuse University USA, December 1988)* after completing the courses needed at the university (See *Exhibit 4.3 WC Copy of relevant courses for my Master of Science in Computer Science from Syracuse University).*

4.1.1.6.Since then, I have wholeheartedly immersed myself in software development, channeling my expertise and unwavering passion into diverse roles within the government and beyond. Among the select few, I possess extensive experience, particularly in agile software development practices (See Exhibit 4.5 WC Copy of My Scaled Agile - DevOps Certificate). Notably, I authored a book titled "Agile Scrum: An Insider View," available on Amazon since April 2023.

4.1.1.7.In 1988, after earning my master's degree in Computer Science from Syracuse University in Syracuse, New York, I began an exciting and impactful 21-year career dedicated to serving the government since September 2002.

4.1.1.8.During this time, I actively contributed to the ever-evolving field of software development, working on various projects and initiatives that helped shape technological advancements and improve government systems. Overall, it was a rewarding and dynamic experience that left a lasting impact on both my career and the organizations I served. (*See Exhibits 5.1 - 5.3*).

4.1.1.9.During this tenure, I dedicated over eight years to the Administrative Office of US Courts (*See Exhibit 1.4 WC Copy of the Letter of My Employment by AOHR*), where I held the position of Branch Manager for Internal Testing under CMSO/Release Manager Division from January 2016 to November 2018, Branch Manager under CMOS/ PPSD from December 2018 to January 2023 (*See Exhibit 2.1 WC Copy of the Resume of Wodajeneh Cherinet*).

4.1.1.10.    Currently, I serve as Branch Manager in the Division of Security, Policy, and Governance, which falls under the Case Management System Office (CMSO) from February 2023 to the present day. I firmly uphold the principles of equal opportunities and merit-based selection processes during the hiring procedure in accordance with federal laws and the internal guidelines of any organization.

4.1.1.11.    During the period from (June 2021 – September 2021), the actions of the AO Human Resources department and the hiring manager diverged significantly from the fundamental principles of fairness and equality.

4.1.1.12. Regrettably, these actions deprived me of my rights to equitable opportunities (See Exhibit 3.6 WC Copy of Notice Letter of Referral - 21-DPS-111369923 and Exhibit 3.10 WC Copy of Outcome of Letter of Referral - 21-DPS-111369923).

4.1.1.13. I experienced blatant discrimination directed at me solely because of my country of origin and age. I am 68 years old (See Exhibit 1.1 WC Copy of Driving License Attesting My Age as a Protected Class) and have an Ethiopian background (See Exhibit 1.5 WC Copy of Verifying My Ethiopian Background).

4.1.1.14. The repercussions of this discriminatory treatment have etched into the fabric of my existence, leaving indelible marks behind. The weight of injustice bears upon me, a burden that defies mere words.

4.1.1.15. Frustration simmers within, fueled by the knowledge that fairness eludes my grasp. Each day, I navigate a landscape where merit is overshadowed, and the scales of equity tilt precariously. The echoes of bias reverberate, and I yearn for resolution, a beacon of light to pierce this shadowed path.

4.1.1.16. Regrettably, the saga did not conclude with the initial discrimination and the biased hiring process. Instead, I found myself ensnared in a trap of vicious retaliation and defamation after Ms. Vijayalakshumi Balasubramian, who had assumed the role of deputy chief.

4.1.1.17. The intensity of this retaliation reached such heights that I began to bemoan the very day of my birth. My professional reputation and personal integrity were both assassinated by this merciless onslaught of retaliation and defamation.

4.1.2. **About the Hiring Process**

4.1.2.1.CMSO, under the Department of Program Services (DPS) within the Administrative Office of US Courts, announced a Job Vacancy Announcement: 21-DPS-11360023, on 06/05/2021, on USAJobs to fill a Deputy Chief of CMSO position (*See Exhibit 3.5 WC Copy of Job Vacancy Announcement*).

4.1.2.2. In response to the job announcement, a total of 58 applicants, including myself, submitted our applications along with our respective resumes, for which all of us have gotten a letter acknowledging the submission of our respective applications (*See Exhibit 3.4 WC Copy of* Applicant Notification).

4.1.2.3.The AOHR team meticulously assessed each candidate's credentials. They examined the information presented in our resumes, scrutinizing qualifications, work experience, and relevant skills.

4.1.2.4.This rigorous evaluation had a specific goal: to determine each candidate's suitability for the Deputy position. The AOHR team methodically weighed factors such as education, experience, competence, and performance in relation to the roles, responsibilities, and alignment with the organization's requirements. The aim was to select the most qualified individual who could effectively contribute to the team and fulfill the duties associated with the Deputy role based on prior work experience, level, and field of educational study or a combination of work experience and education, which are the primary resources for establishing and determining basic qualification standards according to AO Manual § 415.20 Qualifications (a), (b), (c), (d),(e), (f)  and (See Exhibit 3.7 WC Copy of Chapter 4_ Recruitment and Employment _ AOWeb).

4.1.2.5. The AOHR review highlighted my exceptional alignment with the job requirements, education, qualifications, and experience, rating me 100% fitting to the requirement as

a perfect match and placing me among the top 40 most qualified candidates (*See Exhibit 3.1 WC Copy of AOHR Applicants Certificate Eligibles Result page 642 -650*).

4.1.2.6. Conversely, Ms. Vijayalakshumi Balasubramian's credential was ranked 57th out of 58 candidates by the AOHR. It was inexplicably deemed 91% fit for the position (*See Exhibit 3.1 WC Copy of AOHR Applicants Certificate Eligibles Result page 642 -650*).

4.1.2.7. Despite the significant disparity between my credentials and hers, the hiring manager deliberately favored and selected Ms. Vijayalakshumi Balasubramian for the position.

4.1.2.8. This decision was based on several factors, including their shared country of origin, a pre-existing acquaintance, and age. It is evident that these non-merit-based considerations influenced the hiring process, raising concerns about fairness and equal opportunity.

4.1.2.9. My rights as a candidate were not merely brushed aside; they were trampled upon with a callous disregard. Imagine the scene: the very essence of my entitlements, painstakingly built through experience, qualifications, and aspirations, lay vulnerable.

4.1.2.10.    Yet, instead of reverence, they faced a brutal dismissal, a heartless trampling. It was as if the gatekeepers of opportunity had donned heavy boots heedless of the delicate fabric of fairness.

4.1.2.11.    The very foundation upon which fair competition rested, transparency, impartiality, and equal opportunity crumbled beneath the weight of bias. Picture an ancient edifice, the cornerstone of our professional ethos, its stones meticulously laid over generations.

4.1.2.12.    Each block represented a principle: fair competition, where contenders sparred on a level field; transparency, the clear glass through which decisions should be seen; impartiality, the blindfolded arbiter; and equal opportunity, the open gate for all. Yet, this venerable structure quaked, its mortar crumbling. Why? The insidious infiltrator, bias, had wormed its way in, eroding the very bedrock.

4.1.2.13.    But once-pristine marble bore gashes, the marks of favoritism, nepotism, and prejudice. The scales of justice, meant to balance talent, sagged under the weight of unearned privilege. The whispers of the unjust echoed through the leaves, and the gods of meritocracy wept.

### 4.1.3.  **The Internal AO Justice Process**

4.1.3.1. As the selection process unfolded, it became evident that the guiding hand of fate was not impartial. It was swayed by forces unseen, veiled in the cloak of favoritism. The merit I had painstakingly cultivated was overshadowed by invisible strings, pulling the puppetry of destiny. Once symbols of balance, the scales are now tilted toward an undisclosed agenda.

4.1.3.2. Then, at the hiring process's conclusion, the hiring manager officially announced the chosen candidate on 09/22/2021 (*See Exhibit 3.3 WC Copy of Letter of Employment by the then Chief of CMSO Attesting His Favoritism*).

4.1.3.3. On 10/06/2021, I formally lodged an initial complaint with AO OEFP (See Exhibit 3.8 WC Copy of FEP-CP Intake Form -Filled) in response to the announcement that Ms. Vijayalakshumi Balasubramian had been appointed to the Deputy Chief position by Mr. Roy Varghese. Initially, I received substantial guidance from Mr. Daryll D. Butler (AO

FEP Attorney Advisor), who meticulously explained the intricacies of the procedures involved.

4.1.3.4. At first, I felt satisfied with the prompt and efficient assistance I received and the approval to proceed with a formal complaint (See Exhibit 3.9 Notice of Right to File Formal Complaint 6_8_2022). The pace of progress was commendable. However, the process unexpectedly stretched out as time passed, leaving me somewhat bewildered. The relevant authority carried out the investigation. Key AO government individuals were interviewed, including my immediate supervisor, the Deputy Chief of CMSO, and the Department of Program Services Assistant Director (*See Exhibits 11.2 – 11.5*).

4.1.3.5. As the central theme of my appeal, I highlighted the hiring manager's misuse of their office power. Instead of adhering to fair and impartial hiring practices, the manager exhibited a clear bias in favor of Ms. Vijayalakshumi Balasubramian. This preference was influenced by factors such as their shared country of origin, prior acquaintance, and youthful age.

4.1.3.6. In my formal complaint, I explicitly emphasized two critical points forming my appeal: Discrimination Based on Age and National Origin and Retaliatory Acts Afterward (See Exhibit 8.3. WC Copy of Complainant Statement of Motion 11-02-2023). I also endured discrimination during the hiring process due to my age and national origin. These factors should not have influenced the decision-making process, yet they played a significant role in my treatment. This discriminatory approach undermines the principles of equal opportunity and fairness in employment.

4.1.3.7. Following Ms. Vijayalakshumi Balasubramian's appointment, I faced retaliatory actions. These actions directly violated my protected activities for filing a complaint.

Her actions clearly violated the AO manual and code, particularly chapters 3 and 4, which explicitly prohibit discrimination and subsequent retaliation.

4.1.3.8. The cited violations align with federal laws that guard against discrimination and retaliation. These laws shield individuals from unfair treatment based on various characteristics, including age and national origin. I clearly indicated that under the Age Discrimination in Employment Act (ADEA), employers are prohibited from discriminating against employees or job applicants 40 years of age or older. It ensures that decisions related to hiring, firing, promotions, and other employment matters are based on merit rather than age.

4.1.3.9. I underscored Title VII of the Civil Rights Act of 1964 concerning national origin discrimination. This law prohibits employers from mistreating individuals due to their country of origin, ancestry, or ethnicity. It ensures that everyone has an equal opportunity, regardless of background.

4.1.3.10.    About Protection against Retaliation, I underscored that Federal laws recognize that individuals have the right to engage in protected activities without fear of retaliation. These activities include filing complaints, participating in investigations, and advocating for workplace rights. The anti-retaliation provisions embedded in various statutes safeguard employees who exercise these rights.

4.1.3.11.    AO OFEP looked into my complaint and interviewed five people directly related to it. These people include Ms. Libby Smith, Associate Director of the Department of Service; Mr. Roy Varghese, the then Chief of CMSO; Ms. Vijayalakshumi Balasubramian, Mr. Carlos Flores, the then Chief of PPSD; and myself (See Exhibits

11.1 – 11.5). Apart from me, they all represent AO in one way or another, which clouds the investigation's outcome as doubtful and unfair.

4.1.3.12.    While I remain in the dark regarding the selection process for the interviewees, as mentioned earlier, I harbor dissatisfaction with both the selection itself and the interview's focal points. Regrettably, the interview failed to adequately address the crux of my grievance: the discrimination I encountered based on my national origin and age. These pivotal factors significantly impacted my experience and deserved more earnest consideration during the proceedings.

4.1.3.13.    Shortly after the interview, I was presented with a crucial decision: whether to proceed with a Hearing Officer or not for the pursuit of justice. I voted for the Hearing Officer, hoping this path would place me on equal ground and ultimately lead to a fair resolution. Then, Bobbi Britton Tucker was assigned as the Hearing Officer to oversee my case.

4.1.3.14.    On 09/01/2023, the Hearing Officer called for a remote discussion over Microsoft Teams. AO, the respondent, was represented by Ms. Charlene Hardy, and I, Wodajeneh Cherinet, stood for myself as a Complainant. At this junction, the Hearing Officer scheduled an order for 09/08/2023 (See Exhibit 8.2 WC Copy of Scheduling Order 09-08-23).

4.1.3.15.    On November 2, 2023, I meticulously crafted and submitted my statement of motion (See Exhibit 8.3 WC Copy of Complainant Statement of Motion 11-02-2023). Within its carefully woven fabric, I underscored the core focus of my complaint: discrimination based on my age and national origin. These threads of injustice had woven into my professional tapestry, leaving no room for complacency.

4.1.3.16.    But that was not all. My motion also unfurled a secondary point, the aftermath of this discrimination: retaliation. Like ripples in a pond, the repercussions of my grievance extended beyond the initial act, affecting my work environment and well-being.

4.1.3.17.    Within the folds of my motion, I laid bare the substance of my case, the raw nerve of injustice. Facts stood sentinel, their weight bolstered by applicable laws. Like sturdy pillars, my arguments supported the edifice of my plea for justice. And what did I seek from this legal theater? A fair trial, an impartial hearing, and restoring my rights.

4.1.3.18.    And so, with unwavering determination, I presented my case, fortified by 113 exhibits, each a mosaic piece, revealing the mosaic of my struggle. May the scales of justice weigh my case with precision and may the courtroom echo with the urgency of my plea.

4.1.3.19.    On November 3, 2023, the respondent submitted a motion for dismissal along with an alternative motion opposing mine (See Exhibit 8.4 WC Copy of Respondent's Reply to Complainant My Motion Statement 11-03-23). However, this motion fell short in several critical aspects. Notably, it lacked sufficient facts, reasonable arguments, and even a single exhibit to substantiate the case for dismissing my motion.

4.1.3.20.    Instead, the focus of their motion centered solely on the aftermath of the interview conducted by AO OFEP, emphasizing retaliation, a secondary concern. Regrettably, their approach disregarded my primary contention: discrimination based on my national origin and age. The scales of justice must now weigh these imbalances, seeking equilibrium in the face of adversity.

4.1.3.21.    On November 17, 2023, I submitted a motion (See Exhibit 8.5 WC Copy of

Complainant Reply to Respondents Response-11-17-23) in direct opposition to the

respondent's motion for dismissal and their alternative proposal, dated November 3,

2023. In this renewed motion, I again underscored the central pursuit of justice within

my complaint: the discriminatory actions I endured during the hiring process. These

actions, etched into my professional experience, demanded unwavering attention.

4.1.3.22.    I reiterated that, though consequential, retaliation was merely an aftermath,

echoing the initial injustice. The heart of the matter lay in the discriminatory treatment

based on my national origin and age. This time, my motion was meticulously crafted

and fortified with facts, compelling arguments, relevant laws, and precedents. It stood

as a beacon, guiding the trial toward my sought equitable resolution.

4.1.3.23.    On November 27, 2023, the respondent once again submitted a motion for

dismissal, accompanied by an alternative motion opposing mine

(See Exhibit 8.6 WC Copy of Respondent's Final Reply 11-27-23).

Sadly, their approach remained consistent, devoid of substantive arguments, factual

support, or any exhibits that could effectively counter my motion. Instead, they

deliberately veered off course, attempting to divert the spotlight from the heart of my

case: discrimination based on age and national origin.

4.1.3.24.    Their reference to precedents, while intriguing, missed the mark. They cited an

appeal related to discrimination based on race, a matter entirely distinct from mine. The

term "discrimination" was subtly redefined as "subject to select," a semantic sleight of

hand that did not align with the essence of my grievance.

4.1.3.25.   And yet, despite my repeated clarifications that retaliation was secondary, the respondent clung to it as the central theme. Their deliberate focus distortion was akin to rearranging deck chairs on a sinking ship, a futile endeavor that failed to address the iceberg looming ahead. May the courtroom recognize my case's true compass, which points unwaveringly toward justice, fairness, and restoring my rights.

4.1.3.26.   On December 19, 2023, I submitted my final motion (See Exhibit 8.7 WC Copy of Complainant Final Reply to Respondent Response 12-19-23), resolutely opposing the respondent's motion for dismissal, which they had put forth on November 27, 2023. This time, I left no room for ambiguity: the Respondent cannot dismiss my case unless they prove me wrong or unworthy beyond a reasonable doubt. Justice demands nothing less.

4.1.3.27.   I reiterated that if the hiring process was indeed based on merit, devoid of favoritism rooted in shared country of origin, prior acquaintance, and age, then let the evidence speak. Exhibit 2.2 shows Ms. Vijayalakshumi Balasubramian's credentials, education, experience, competence, and performance. Lay them side by side with mine. Yet, the Respondent faltered, unable to present substantive evidence that would elevate Ms. Vijayalakshumi Balasubramian above me.

4.1.3.28.   And so, my question echoes: If I were the superior candidate, why was I disregarded while Ms. Vijayalakshumi Balasubramian was selected and hired? The crux of my quest for justice lies here, where the Respondent's case falters, devoid of facts to substantiate their stance. May the courtroom weigh these truths impartially, and may justice prevail.

4.1.3.29.   Then, the case Hearing Officer initially scheduled the final hearing and/or verdict for December 18, 2023, as stated in the Scheduling Order of 09/08/23. Then, it changed to February 15, 2024 (See Exhibit 8.1 WC Copy of Final Hearing Date rescheduled from 12-18-23 to Feb 15, 2024). However, it did not proceed as planned. Instead, it was rescheduled for after February 16, 2024 (See Exhibit 8.9 WC Copy of Final Hearing Date To be rescheduled by After Feb 16, 2024). Unfortunately, even after this rescheduling, no progress occurred. The matter was handled hastily, without any communication or updates.

4.1.3.30.   According to the AO Manual, Vol. 4 (Human Resources), Ch. 3 (Workplace Conduct and Protections), § 350.60 Formal Complaint Process – Hearing and Recommendation, (g)(3) If the hearing officer recommends summary dismissal or determination, the Recommended Decision must be issued within 120 days after receipt of the Assignment of Hearing Officer Letter unless an extension is agreed upon by the parties (See Exhibit 8.8 WC Copy of AO Manual, Vol. 4 (Human Resources), Ch. 3 (Workplace Conduct and Protections)). Disregarding this, the Hearing Officer, who was assigned in August 2023, didn't issue any decision, even after eight months as of April 3, 2024. This is way more than 240 days, with no extension requested and/or agreed upon by concerned parties.

4.1.3.31.   Being frustrated by what was unfolding on the ground, I penned a letter to AO OFEP, dated April 3, 2024, expressing my dissatisfaction with the protracted justice process (See Exhibit 8.10 WC Copy of Complainant Urgent Concern Regarding Delayed Justice with AO – OFEP Case No. FY 2022-01 April 3, 2024). Thirty-one months had already elapsed, an agonizing delay that felt like justice denied. In that

letter, I clarified my intentions: if justice continued to elude me, I would take the matter to the appropriate court.

4.1.3.32.    On the same day, I received two spontaneous letters. The first, from AO Fair Employment Practices (AO OFEP), attempted to rationalize the delay (See Exhibit 8.11 WC Copy of AO Response to Complainant Urgent Concern Regarding Delayed Justice with AO – April 3, 2024). Yet, it failed to address the heart of my grievance: discrimination. The second communication arrived via email from the Hearing Officer. It was labeled as a verdict, but buried within its content was a recommendation (See Exhibit 8.12 WC Copy of AO Hearing Officer's Report and Recommendation April 3, 2024).

4.1.3.33.    Dissatisfied with the substance of the recommendation, I penned a sort of appeal, treating it as a verdict since it was directly addressed to me (See Exhibit 8.16 WC Copy of Complainant Appeal of Verdict Response to AO Hearing Officer Recommendation Report April 4, 2024). Simultaneously, I crafted a letter of objection, assuming it was merely a recommendation.

4.1.3.34.    My objection, dated April 4, 2024 (See Exhibit 8.16), underscored a critical divergence: the recommendation veered from the core issue, discrimination. Instead, it fixated on retaliation, a secondary point within my application. Even then, it failed to assess the facts meticulously presented during the proceedings. The Respondent (AO OFEP) used the same delaying tactics and responded to my objection to the Hearing Officer's recommendation (See Exhibit 8.17 WC Copy of AO Response to Complainant Appeal Response April 4, 2024). I further explained that this communication was not exclusively directed to the AO OFEP; it reached me directly. Consequently, I exercise

my right to provide a clear and focused reply (See Exhibit 8.18 WC Copy of Complainant Response to AO OFEP about Hearing Officer Recommendation Report April 5, 2024).

### 4.1.4. My Decision to Appeal to the Court

4.1.4.1.In my case, I have consistently emphasized the discrimination I faced based on my age and national origin during the hiring process for the Deputy Chief position. I made this clear in all the motions I submitted, and in every communication, I had with the Hearing Officer. However, it appears that the core of my grievance has been intentionally overlooked and diverted to the issue of retaliation, the second focus of my appeal, which occurred as a consequence of the discriminatory acts I endured.

4.1.4.2.Of particular concern is the recommendation made by the Hearing Officer dated and emailed out on April 03, 2024, which disapproved of my complaint (See Exhibit 8.12 WC Copy of AO Hearing Officer's Report and Recommendation April 3, 2024). This recommendation completely disregarded the substance of my initial complaint and instead focused on the Respondent's argument on retaliation. This biased approach undermines the principle of equal treatment for both parties, the Complainant, and the Respondent.

4.1.4.3.As a result, my trust in the internal justice process has waned. I plan to take the matter directly to the most relevant court, as permitted by the applicable code for age discrimination cases. Despite my best efforts to seek justice through internal channels, my pursuit has been met with disappointment. I raised the issue with the Office of Fair Employment Practices (OFEP), but the desired resolution remains elusive. Instead, the

prolonged procedure and deliberate redirection toward retaliatory actions have eroded my confidence in the internal justice system.

## 5. Actions of the Parties Involved

### 5.1. The Administrative Office of US Courts (AO)

5.1.1.   As per AO Manual Article 310 and its employment regulations and practices, AO employees are governed by the Personnel Act of 1990. AO must establish a merit-based personnel system that ensures fair employment practices, prevents discrimination, and avoids prohibited personnel practices, among many other things *(see Exhibit 10.6 WC Copy of Chapter 3_ Workplace Conduct and Protections _ AOWeb).*

5.1.2.   The merit-based personnel system requires the AO management to protect such principles as requiring qualified individuals from all segments of society, selecting and advancing employees based on merit, and conducting fair employment practices that result in always treating employees and applicants equitably without regard to race, color, religion, age, sexual orientation, national origin, political affiliation, marital status, disability, and retaliation *(Exhibit 10.7 WC Copy of Chapter 4_ Recruitment and Employment _ AOWeb).*

5.1.3.   The Administrative Office (AO) has fallen short in furnishing comprehensive guidance and safeguarding candidates' rights during the hiring process. Regrettably, it allowed the Hiring Manager, Mr. Roy Varghese, who was then the Chief of CMSO, to wield disproportionate authority, leading to the implementation of employment practices that were unjust, prejudiced, and discriminatory.

5.1.4. These actions directly contravened the principles outlined in the Fair Employment Practice *(Exhibit 10.5 WC Copy of Fair Employment Practices _ AOWeb)* and other relevant Federal Laws.

5.1.5. During the employment process conducted by and through AO to fill the Deputy Chief of CMSO role from Date to Date, AO failed to intervene and rectify the situation when the hiring process veered off course.

5.1.6. The letter, which Mr. Roy Varghese, the then CMSO Chief/ hiring manager, communicated to CMSO staff on 09/22/2021, reveals the impact of favoritism on the candidate's hiring process and highlights the AOHR's collaboration with the hiring manager in perpetuating this bias.

5.1.7. In simpler terms, the letter provides evidence of both favoritism and the AOHR negligence in the hiring process *(See Exhibit 3.3 WC Copy of Letter of Employment by the then Chief of CMSO Attesting His Favoritism)*.

5.1.8. The actions manifested in the hiring process don't only emphasize the severity of the hiring process which went beyond mere violation of fundamental principles set forth by the Fair Employment Act *(See Exhibit 10.5 WC Copy of Fair Employment Practices _ AOWeb)* and the AOHR Chapter 3 and 4 of the Hiring Manual *(See Exhibit 10.6 W Copy of Chapter 3_ Workplace Conduct and Protections _ AOWeb and Exhibit 10.7 WC Copy of Chapter 4_ Recruitment and Employment _ AOWeb)*.

5.1.9. It also transgressed the fundamental principles governing an employee vested with authority over personnel matters. Specifically, the hiring manager exhibited discriminatory behavior towards employees, including myself, and misused their authority as the Chief of CMSO in personnel-related decisions.

5.1.10. Such conduct is prohibited under federal law, which prohibits discrimination based on race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability, or genetic information during the hiring process, and also by the Chatter 4 of the AO Manual (*See Exhibit 10.7 WC Copy of Chapter 4_ Recruitment and Employment _ AOWeb*).

5.1.11. Additionally, retaliation against individuals complaining about discrimination or participating in an employment discrimination investigation is illegal. Employers must ensure fair and unbiased hiring practices and address any violations promptly and appropriately.

5.1.12. Despite filing a complaint regarding the discriminatory and retaliatory actions I endured during the hiring process for the Deputy Chief of CMSO role, justice has not been served even after nearly three years. An inappropriate candidate ultimately filled the office through the organization's internal procedures.

5.1.13. Despite my persistent efforts, matters remain unresolved. Recognizing that delayed justice is tantamount to denied justice, I am compelled to bring this issue to the attention of this honorable court.

5.2. **Mr. Roy Varghese, the then Chief of CMSO (The Hiring Manager)**

5.2.1. Despite me, Wodajeneh Cherinet, being ranked among the top 40 candidates whose resumes 100% match the role, Mr. Roy Varghese's decision to select and hire Ms. Vijayalakshumi Balasubramian who ranked as the 57th least qualified candidate out of 58 applicants with her resume matching only 91% of the job description (*See Exhibit 3.1 WC Copy of AOHR Applicants Certificate Eligibles Result page 642 -650*), for the vacant Deputy Chief of CMSO role raises severe concerns about Fair Employment

Practices *(Exhibit 10.7 WC Copy of Chapter 4_ Recruitment and Employment _ AOWeb)*.

5.2.2.  Such actions of the hiring manager appear to be a clear violation of the principles governing fair employment and constitute discrimination. I was discriminated against based on my national origin and age while being the most qualified candidate to fill the position *(See Exhibit 3.1 WC Copy of AOHR Applicants Certificate Eligibles Result page 642 -650)* than Ms. Vijayalakshumi Balasubramian. It is clear that the hiring manager's prior acquaintance with Ms. Vijayalakshumi Balasubramian and their shared country of origin, India, along with the perception that she appears younger than me, seem to be biased factors in the employment process (See Exhibit 10.1 WC Copy of a Document that Depicts Mr. Roy Varghese National Origin).

5.2.3.  Discrimination based on national origin and age is indeed a violation of the law. Under federal law, an employer cannot illegally discriminate in its hiring process based on a job applicant's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability, or genetic information. Title VII of the Civil Rights Act of 1964 prohibits such discrimination.

5.2.4.  In the landmark case of Griggs v. Duke Power Co., for instance, the U.S. Supreme Court made a significant ruling under Title VII of the 1964 Civil Rights Act. The case centered on the legality of Duke Power Company's employment practices, specifically their requirement for a high school diploma and satisfactory scores on two general aptitude tests as prerequisites for advancement within the company.

5.2.5.  The Court unanimously held that such standardized testing disproportionately hindered African-American employees from accessing higher-paying departments, even though

the policies were not explicitly intended to discriminate. This decision established the legal precedent for "disparate impact" lawsuits, where seemingly neutral criteria can still be discriminatory if they disproportionately affect a particular group.

5.3. **Ms. Vijayalakshumi Balasubramian (The favored & Hired Candidate)**

5.3.1. After assuming the role of Deputy Chief of CMSO, Ms. Vijayalakshumi Balasubramian engaged in a series of retaliatory actions and defamatory behavior towards me. The 18 exhibits presented within Exhibit 9 WC Retaliation Verifying Docs are compelling evidence substantiating matters directly related to the underlying fact. Their collective weight reinforces the case and underscores the significance of the factual assertions.

5.3.2. She misused her authority, interrupting and overtaking my meetings, ridiculing and defaming me, interfering with my responsibilities, and making unlawful decisions. Also, she reversed my legitimate reputation decisions without proper justification, tarnishing my previously established professionalism (*See Exhibit 9.17 WC Copy of Deputy Chief Overriding My Decision Assignments to My Subordinates and Exhibit 9.18 WC Copy of Interference by Deputy Chief retaliating by blaming and shaming me*).

5.3.3. The root cause of these punitive actions lies solely in my appeal to AO, urging an investigation into the hiring process for the Deputy Position of CMSO. I firmly believe that this process was unfair, biased, and illicit. Such actions are prohibited by the AO Manual *(Exhibit 10.7 WC Copy of Chapter 4_Recruitment and Employment _AOWeb)* and federal law, which prohibits retaliation against individuals who complain about discrimination or participate in an employment discrimination investigation.

5.3.4. In the case of Watson v. McDonough (No. 19-3127, 8th Cir. 2021), for instance, the plaintiff filed an employment discrimination complaint. Subsequently, the employer

allegedly retaliated against him by implementing several adverse actions. These retaliatory measures included reducing his job responsibilities, providing significantly lower performance evaluations, mandating remedial training, and placing negative reports in his personnel file.

5.3.5.   Despite the absence of explicit discriminatory intent, these actions constituted retaliation against the plaintiff for asserting his rights under Title VII of the Civil Rights Act of 1964. This case underscores the importance of protecting employees who oppose discriminatory conduct and highlights the broad scope of retaliation claims.

5.3.6.   Employers must be cautious not to take actions that could dissuade individuals from resisting or reporting future discrimination. Retaliation remains a critical area of concern in employment law, and legal precedents like this serve as essential guidance for employers and employees.

5.3.7.   The relentless cycle of retaliatory actions and defamations has taken a severe toll on my well-being. I've lost my peace of mind and any semblance of joy. The stress has made me irritable, unhappy, and deeply depressed. My physical health has suffered significantly; my blood sugar levels have spiked, and my blood pressure has escalated to the point of causing nosebleeds.

5.3.8. In the past 2 years and 7 months, I have endured significant emotional distress due to the actions of AO, facilitated by CMSO Deputy Chief Ms. Vijayalakshumi Balasubramian. My filing of a discrimination complaint triggered this distress. As a result, I sought professional assistance to cope with the emotional toll (See Exhibit 12.1. WC Copy of Medical Evidence Consulted my doctor to see Psychiatrist -02 08 22). Initial assessment was conducted (See Exhibits 12.1 – 12.3).

5.3.9. My treatment journey included sessions with a psychiatrist, psychologist, and counselor. Specifically, I participated in anxiety and depression sessions conducted by a psychiatrist (*See Exhibits 12.4 – 12.11*). The impact of this distress has been far-reaching: my nights have been restless, plagued by insomnia, my ability to find joy in life has diminished, I grapple with inner turmoil and emotional pain, my standing and reputation have suffered, and my interactions with family and friends have become strained.

5.3.10. Restlessness and sleeplessness plague me, leaving me feeling utterly hapless. It's as though my entire career and character have been ruthlessly assassinated and overthrown. The retaliation continues unabated. My professional insights are.

5.3.11. consistently dismissed and disregarded. It's as if I exist merely to draw a salary, not to build a meaningful career. The emotional pain is overwhelming, and that's precisely why I seek justice in this matter.

## 5.4. Summary of the Backgrounds

5.4.1. Given the immense hardships, damages, and profound deprivation of rights I have endured as a U.S. citizen, I am resolutely seeking substantial compensation in the

amount of $8.3 million. I firmly believe that holding the perpetrators accountable for their unlawful actions is imperative, ensuring that they face appropriate consequences.

5.4.2.  In support of this appeal, I have meticulously compiled 113 exhibits, each documenting critical aspects of the case. Additionally, I present quite a good number of legal precedents from verdicts in similar cases, reinforcing the gravity of the matter.

5.4.3.  I have more than more than 15 in-person witnesses who can provide firsthand accounts and corroborate the facts before the court. I fervently hope and unwaveringly believe that the court will diligently examine these details and dispense justice accordingly.

## 6.  Arguments

### 6.1.  Argument on our Academic Qualification

### 6.1.1.  Introduction

6.1.1.1.In the realm of employment, fair and unbiased hiring practices are essential to uphold equal opportunities for all candidates. Discrimination based on education can significantly impact the selection process.

6.1.1.2. In this case, I contend that Ms. Vijayalakshumi was favored, selected, and hired for the vacant position despite my superior qualifications. I hold a master's degree in Computer Science from an accredited university, while Ms. Vijayalakshumi's sole degree, a bachelor's in Radio Communication, was obtained from an unaccredited college/university.

### 6.1.2.  Factual Background on My Qualifications

6.1.2.1.I possess a master's degree in Computer Science from Syracuse University, located at 900 S Crouse Ave, Syracuse, NY 13210 (See Exhibit 4.2 WC Copy of my Master of Science in Computer Science from Syracuse University USA, December 1988). I also

have a first degree in Mathematics from Addis Ababa University, located in Addis Ababa, Ethiopia (See Exhibit 4.1 WC Copy of my Bachelor of Science in Mathematics from Addis Ababa University, August 1980). Both of my degrees showcase my specialized expertise and skills, which directly align with the requirements of the Deputy Chief's position job description.

6.1.2.2. My education in both areas is from accredited universities and reflects rigorous standards and adherence to quality benchmarks. Syracuse University has been accredited by the Middle States Commission on Higher Education (MSCHE) since 1921, an accrediting agency recognized by the U.S. Secretary of Education and the Council for Higher Education Accreditation.

6.1.2.3. Addis Ababa University is the oldest university in Ethiopia, established in 1950. It is legally recognized and institutionally accredited by the Ministry of Education of Ethiopia, which admits qualified students to AAU based on their score on the Ethiopian University Entrance Examination (EUEE).  Its first recognition or accreditation dates back to 1950. It is also accredited by the Higher Education Relevance and Quality Agency (HERQA) (See Exhibit 10.2 WC Copy of an Addis Ababa University Global Ranking):

6.1.3.  **Factual Background on Ms. Vijayalakshumi's Qualifications**

6.1.3.1. Ms. Vijayalakshumi holds only a bachelor's degree. However, the degree type and the university where she was awarded the degree are clouded.  According to her resume, she has a BE Degree in Electronics and Communication from Mysore University located in Mysore, Karnataka, India (*See Exhibit 2.2 WC Copy of the Resume of Ms. Vijayalakshumi* Balasubramian).

6.1.3.2.In her publicly accessible LinkedIn profile, she asserts that she obtained her degree from Malnad College of Engineering, situated in Hassan, in the year 2000 (*see Exhibit 10.4 WC Copy of Ms. Vijayalakshumi Balasubramian LinkedIn Profile*). However, intriguingly, she refrains from specifying her field of study. The omission of this crucial detail, along with the disparity of the contents between her resume and her public profile, leaves us with a tantalizing mystery, inviting curiosity about her academic pursuits during that period.

6.1.3.3.To the best of my knowledge, there is no documented evidence confirming whether any of these universities hold international accreditation or if their degrees are equivalent to those obtained in the United States. Additionally, it highlights that the field of Electronics and Communication has minimal relevance to the software industry, whether in technical or managerial capacities.

### 6.1.4.  **Legal Arguments**

6.1.4.1. Disparate Treatment and Title VII: Title VII of the Civil Rights Act prohibits disparate treatment based on protected characteristics, including education. Favoring Ms. Vijayalakshumi over me despite my superior qualifications constitutes disparate treatment. The decision to hire her, despite her lesser degree and unrelated field, raises discrimination concerns.

6.1.4.2.In the realm of professional success, education plays a pivotal role. Courts acknowledge that the skills acquired through formal education significantly influence job performance. My master's degree is a testament to my specialized knowledge and expertise. It directly aligns with the position I aspire to hold.

6.1.4.3. The curriculum emphasizes that the curriculum has provided me with essential and applicable skills, ensuring my readiness to meet the job requirements. The court would duly acknowledge the value of my educational foundation, recognizing its potential impact on my success in the role.

6.1.4.4. Furthermore, I hold a first degree in Mathematics, which significantly enhances my relevance to the field of software engineering. This mathematical background further strengthens my qualifications for the position.

6.1.4.5. In the arena of academic qualifications, the disparity between Ms. Vijayalakshumi's sole degree in Electronics and Communication and my Master's degree in Computer Science is stark. My Master's degree delves into the intricacies of computer science, covering a broad spectrum of topics. From algorithms and data structures to software engineering principles, I have acquired a comprehensive understanding.

6.1.4.6. In contrast, Ms. Vijayalakshumi's degree in Electronics and Communication, while valuable in its own right, lacks the same depth and breadth. It primarily focuses on communication systems, electronic design, and related fields.

6.1.4.7. If we were to quantify our educational paths, my investment in courses and skill acquisition far surpasses hers. I have diligently honed my abilities, ensuring they resonate with the dynamic landscape of software engineering.

6.1.4.8. While Ms. Vijayalakshumi's degree is commendable, it lacks the same intensity of preparation. Her exposure to software-related concepts remains limited. The software industry thrives on innovation, coding prowess, and leadership acumen. My educational journey aligns seamlessly with these industry demands.

6.1.4.9.I have meticulously curated my coursework, acquiring skillsets directly relevant to software development and managerial roles. These include programming languages, software architecture, project management, and team leadership.

6.1.4.10.   Ms. Vijayalakshumi's minimal skillset, likely acquired during her pursuit of the aforementioned degree, falls short in addressing the multifaceted requirements of the software industry.

6.1.4.11.   In summary, the court would find it untenable to equate Ms. Vijayalakshumi's Electronics and Communication degree with my robust Master's degree in Computer Science. The scale tip decidedly favors educational relevance, depth, and practical applicability, attributes that significantly impact our potential contributions to the field.

6.1.5. **Conclusion**

6.1.5.1.Despite Ms. Vijayalakshumi's inferior qualifications, she was favored and ascended to take the position while my extensive background languishes in the shadows. My superior education, relevant skills, and hard-earned accreditation should have been decisive factors, a beacon guiding the selection process.

6.1.5.2.Legal protections, intertwined into the fabric of our justice system, underscore the significance of relevant education. The doctrine of precedent, a cornerstone of jurisprudence, demands that judges heed the echoes of prior rulings. In this parallel, I seek a precedent, a court verdict that resonates with my plight, a testament to the weight carried by experience and the battle against discrimination.

### 6.2. Argument on our Experience

### 6.2.1. Introduction

6.2.1.1. In the context of employment, the principle of equal opportunity demands that hiring decisions be based on merit, qualifications, and relevant experience. However, in my case, despite my extensive 19-year hands-on experience in 2021 in various capacities within the software industry while working for the government,

6.2.1.2. I faced discrimination during the hiring process. Ms. Vijayalakshumi, with no direct software industry experience in government roles, was inexplicably favored and selected for the position. This disparity raises severe concerns about discrimination.

### 6.2.2. Factual Background on My Experience

6.2.2.1. I have accumulated close to two decades of practical specialized experience in the software industry working for the government as a permanent government employee. My roles spanned: Agile leader, DevSecOps engineer, developer/tester, architect, project manager, program manager, release manager, release train engineer, leader, mentor, and branch manager (See Exhibit 2.1 WC Copy of the Resume of Wodajeneh Cherinet and Exhibit 4.5 WC Copy of My Scaled Agile - DevOps Certificate). This extensive experience was gained while working directly for the government.

### 6.2.3. Factual Background on Ms. Vijayalakshumi's Experience

6.2.3.1. Ms. Vijayalakshumi's nearly 20 years of experience is not hands-on in the software industry, working in limited capacities. Her background primarily involves work with private companies, often contracted by the government. Her experience lacks the

depth and direct relevance to the position. She lacks relevant skillsets gained from accredited institutions.

### 6.2.4. Legal Arguments on Our Experiences

6.2.4.1. Disparate Treatment and Title VII: Title VII of the Civil Rights Act prohibits disparate treatment based on protected characteristics, including experience. Favoring Ms. Vijayalakshumi, despite her inferior experience, constitutes disparate treatment. The decision to hire her, disregarding my extensive hands-on background, suggests discrimination.

6.2.4.2.Relevance of Experience: Courts recognize that practical experience significantly impacts job performance. My diverse roles within the government directly relate to the position. Ms. Vijayalakshumi's experience, primarily with private companies, lacks this alignment. In Watson v. McDonough, the court emphasized that adverse employment actions must meet Title VII criteria.

### 6.2.5. Conclusion

6.2.5.1.The hiring manager's preference, veiled in the guise of impartiality, casts a shadow of discrimination. Despite Ms. Vijayalakshumi's lack of hands-on experience and relevant skillsets, she ascends while my extensive background languishes in the shadows. My journey, fortified by accredited education, should have been the decisive factor, a beacon guiding the selection process.

6.2.5.2.Legal protections, woven into the fabric of our justice system, underscore the significance of relevant experience in hiring decisions. The doctrine of precedent, a cornerstone of jurisprudence, demands that judges heed the echoes of prior rulings. In

this parallel, I seek a precedent, a court verdict that resonates with my plight, a testament to the weight carried by experience and the battle against discrimination.

### 6.3. Argument on our Performance

### 6.3.1. Introduction

6.3.1.1. In the context of employment, performance evaluation plays a pivotal role in determining an employee's suitability for a position. However, in my case, despite a consistent track record of excellence over two decades, I faced discrimination during the hiring process. I have received 17 awards for outstanding performance and achievements while working in various capacities within the government's software development projects.

6.3.1.2. These accolades include certificates, cash rewards, and recognition letters, all of which I have attached as Exhibit 6 WC Performance Verifying Docs. In contrast, Ms. Vijayalakshumi, who lacks significant recognition, was inexplicably favored and hired. Her limited awards were obtained as a contractor, not as a government employee, which requires a higher level of discipline, hard work, and diligence.

### 6.3.2. Factual Background on My Performance Record

6.3.2.1. Over the course of two decades, my track record has consistently showcased exceptional performance. My multifaceted contributions have spanned roles such as developer, tester, architect, project manager, and program manager, each underscored by technical expertise and leadership acumen within the software development industry. The government has duly recognized my achievements through 17 awards, a testament to my sustained excellence (See Exhibits 6.1 – 6.17).

### 6.3.3.  Factual Background on Ms. Vijayalakshumi's Performance

6.3.3.1. Ms. Vijayalakshumi's performance lacks significant recognition. Her limited awards were obtained as a contractor, not as a government employee. The distinction between government employment and contracting underscores the rigor and expectations associated with the former.

### 6.3.4.  Legal Argument of Performance

6.3.4.1. Office performance directly correlates with an employee's ability to fulfill job responsibilities effectively. It encompasses not only technical competence but also factors such as teamwork, adaptability, and commitment. Employers have a legitimate interest in assessing an employee's performance to ensure organizational productivity, client satisfaction, and overall success.

6.3.4.2. When evaluating disciplinary actions or employment decisions, office performance acts as a Douglas factor. This factor considers an employee's past service record, including their consistent performance. A strong performance history can serve as a mitigating factor, justifying a reduction in penalties or influencing retention decisions. Conversely, poor performance may aggravate disciplinary actions, leading to reprimands, demotions, or even termination.

6.3.4.3. The Santos v. National Aeronautics and Space Administration decision by the U.S. Federal Circuit Court emphasized that an agency must establish an employee's unsatisfactory performance when appealing removal actions. Moreover, Courts recognize that relevant experience and performance should guide employment decisions. The burden lies with employers to demonstrate cause for adverse actions based on performance.

### 6.3.5.  Conclusion

6.3.5.1. Upon careful examination, it becomes evident that my performance has been cultivated within the hallowed halls of government offices, where I served as a dedicated employee. This direct alignment with the announced vacancy underscores the relevance of my experience.

6.3.5.2. Notably, eight of my fruitful years were spent at AO US Courts under CMSO, an epoch that bears particular significance for the position at hand. The monetary awards and accolades I garnered during my tenure in these government offices are irrefutable evidence of my excellence and unwavering productivity.

6.3.5.3. In stark contrast, Ms. Vijayalakshumi's performance trajectory unfolded as a contractor, navigating the labyrinthine corridors of various private sectors, some of which subcontracted projects from the government. Any awards or certifications attesting to outstanding performance are curiously absent from her resume.

6.3.5.4. Despite my stellar expertise, Ms. Vijayalakshumi secured the position, seemingly propelled by her prior acquaintance with the hiring manager and our shared country of origin. Meanwhile, I grapple with the bitter taste of discrimination; my age and national origin cast shadows upon my aspirations.

6.3.5.5.  In summary, office performance transcends mere metrics. It shapes careers, organizational outcomes, and legal precedents. Employers must weigh this factor judiciously to ensure fairness and adherence to legal standards.

### 6.4. Argument on our Competence

### 6.4.1. Introduction

6.4.1.1. Competence recognition plays a pivotal role in assessing an employee's suitability for a position. Over my 20-year career in the software industry, I have received nine significant recognitions from friends, supervisors, and end users. These accolades, including certificates and commendations, validate my exceptional competence while working as a government employee.

6.4.1.2. In contrast, Ms. Vijayalakshumi, despite her tenure in various software industry capacities, lacks substantial recognition. Her limited awards, obtained as a contractor rather than a government employee, raise concerns about the fairness of her selection.

### 6.4.2. Factual Background on My Competence Recognition

6.4.2.1. In the dynamic realm of software development, my journey has been marked by unwavering competence and impactful leadership. Allow me to elaborate on the layers of recognition and dedication that underscore my professional trajectory.

6.4.2.2. My colleagues and supervisors have consistently acknowledged my technical prowess (See Exhibit 7.6 WC Copy of Competence Attesting Recognition from CMSO colleague, August 2021 and Exhibit 7.7 WC Copy of Competence Attesting Recognition from CMSO colleague, August 2021). Whether it's architecting complex systems, optimizing algorithms, or debugging intricate code, I stand at the forefront.

6.4.2.3. End users, the ultimate beneficiaries of our software solutions, have experienced the fruits of my labor firsthand. Their feedback echoes my ability to translate intricate technical concepts into tangible, user-friendly applications.

6.4.2.4. Beyond mere technical excellence, I've assumed leadership roles within Government offices in DHS/USCIS, DOC/USPTO, and AO. As a team lead, I've orchestrated collaborative efforts, fostering innovation and cohesion.

6.4.2.5. My leadership extends beyond project management. I've mentored junior developers, instilling best practices and nurturing their growth (See Exhibit 7.8 WC Copy of Competence Attesting Recognition from my direct report, March 2022). The impact ripples through our entire software development ecosystem.

6.4.2.6. Within the government landscape, my contributions resonate across diverse roles. My fingerprints adorn the digital fabric, from critical infrastructure projects to citizen-facing applications.

6.4.2.7. The recognition I've garnered isn't confined to a single department or agency. It spans ministries, bureaus, and intergovernmental collaborations, a testament to my unwavering dedication (See Exhibit 7.5 WC Copy of Competence Attesting my Gold Award Recognition, November 2007, Exhibit 7.5.1 WC Copy my Gold Award Ceremony Picture November 2007, and Exhibit 7.4 WC Copy of Competence Attesting Recognition USCIS CIO, August 2014).

6.4.2.8. In summary, my competence transcends technical acumen; it embodies leadership, adaptability, and a relentless pursuit of excellence. The accolades bestowed upon me are not mere tokens; they mirror the impact I've made within the software development arena. All nine recognitions are documented and attached as Exhibit 7 WC Competence Verifying Docs.

### 6.4.3. Factual Background on Ms. Vijayalakshumi's Competence

6.4.3.1. Ms. Vijayalakshumi 's performance lacks significant recognition. The few recognitions she received were as a contractor, not as a government employee. Government roles demand discipline, hard work, and diligence, which her contractor experience may not fully reflect.

### 6.4.4. Legal Arguments

6.4.4.1. Competence is a critical factor in the intricate dance of employment decisions. Title VII of the Civil Rights Act, a sentinel of fairness, explicitly prohibits disparate treatment based on protected characteristics, including competence.

6.4.5.    I, Wodajeneh Cherinet, with a track record of exceptional competence, have garnered recognition across the professional landscape. His technical acumen, leadership finesse, and unwavering dedication are well-documented. My competence isn't a mere footnote; it's a symphony of skills that resonate in the corridors of software development.

6.4.6.    On the other side of the scale, we find Ms. Vijayalakshumi. Her recognition, though limited, is akin to a whisper in a crowded room. The court would raise an eyebrow at this juncture. Why favor her despite the glaring disparity in competence validation?

6.4.6.1. The decision to hire Ms. Vijayalakshumi, overlooking my extensive competence, dances perilously close to disparate treatment. My qualifications, akin to a well-tuned instrument, should have resonated louder. Yet, they were drowned out by an inexplicable preference.

6.4.6.2. Discrimination often wears a subtle cloak. It doesn't always announce its arrival with fanfare. The choice to disregard my competence hints at a deeper bias, one that sidesteps merit and veers into murky territory.

6.4.6.3. In summary, the courtrooms of justice frown upon such disparities. My competence isn't a mere statistic; it's the heartbeat of progress. To favor Ms. Vijayalakshumi, despite her limited recognition, raises questions. Is it a misstep? Or does it hint at discrimination lurking in the shadows? The scales of justice await their calibration.

### 6.4.5. Conclusion

6.4.5.1. The hiring manager's favoritism toward Ms. Vijayalakshumi, despite her limited recognition of competence, raises concerns about discrimination. My own impressive track record and consistent excellence should have been decisive factors in the selection process. It is essential to recognize that legal safeguards exist to prevent unequal treatment based on competence when making hiring decisions.

6.4.5.2. It's essential to recognize that legal safeguards exist precisely to prevent unequal treatment based on competence. Title VII of the Civil Rights Act stands as a sentinel against discrimination. Competence isn't a mere buzzword; it's the lifeblood of organizational progress. Courts uphold this principle, ensuring that merit trumps bias.

6.4.5.3. Organizations, like delicate ecosystems, thrive when they acknowledge and value competence. It's not a mere checkbox; it's the compass guiding success. By fostering a fair and equitable workplace, organizations create a fertile ground for growth. Competence becomes the currency of advancement.

6.4.5.4. In the grand hiring theater, the spotlight should illuminate qualifications and achievements. Personal preferences or biases should fade into the wings. Every candidate, regardless of background or connections, deserves equal consideration. The scales of justice tip in favor of competence.

6.4.5.5. In summary, let us recalibrate the hiring process. Let qualifications be the litmus test and competence be the North Star. When the curtain rises, may it reveal a stage where all contenders stand on equal footing.

## 6.5. Argument on our AOHR Ranking

### 6.5.1. Introduction

6.5.1.1. After the Deputy Chief position was announced on the USAJobs portal on 06/05/2021, a total of 58 applicants submitted their resumes to the AOHR office. The office meticulously evaluated these resumes, ranking them based on their alignment with the job description for the position. With this evaluation complete, the outcome was relayed to the hiring manager, the then CMSO Chief, who anticipated summoning the top 40 candidates for the next filtering phase.

### 6.5.2. Factual Background on My Performance Ranking

6.5.2.1. Among the 58 applicants, the AO Human Resources department has singled out my resume as one of the top 40, with a 100% perfect match for the position.

### 6.5.3. Factual Background on Ms. Vijayalakshumi's Ranking

6.5.3.1. Among the 58 applicants, the AO Human Resources department has singled out Ms. Vijayalakshumi's resume as 57th, with a 91% for the position (See Exhibit 3.1 WC Copy of AOHR Applicants Certificate Eligibles Result page 642 -650).

### 6.5.4. Legal Argument

6.5.4.1. The decision of the hiring manager to hire Ms. Vijayalakshumi, ranked second from the last, despite her 91% fitting resume, defies logic. The hiring manager's choice to select Ms. Vijayalakshumi, who languished as the 57th-ranked applicant out of 58,

despite her 91% fitting resume, defies all rationality. The chasm between her qualifications and her ranking raises eyebrows.

6.5.4.2. The hiring manager's choice defies logic. Why elevate Ms. Vijayalakshumi from the depths of the ranking abyss? Her qualifications, like a beacon, should have propelled her higher. Instead, she clings to the second-to-last rung.

6.5.4.3. Justice, like a vigilant sentinel, demands clarity. Merit, competence, and experience should ascend unimpeded. The veil of unfairness shrouding this decision isn't merely illustrative; it's punishable by law. The echoes of consequence resonate through the corridors of accountability.

6.5.4.4. The scales of justice tilt toward merit, competence, experience, and fairness. My claim reverberates, asserting that the veil of unfairness shrouding this decision is both illustrative and punishable by law. Justice demands that the deserving ascend, and the echoes of consequence resonate through the corridors of accountability.

6.5.5.  **Conclusion**

6.5.5.1. In the grand theater of hiring, decisions echo far beyond the boardroom. The spotlight falls on Ms. Vijayalakshumi, a candidate whose resume, despite boasting a 91% fit, languished as the 57th preference out of 58.

6.5.5.2. The hiring manager's choice defies reason. Why elevate Ms. Vijayalakshumi, bypassing the top 40 luminaries whose resumes fit the position like a glove? Their qualifications, akin to celestial constellations, should have guided the decision. Instead, they remain backstage, overshadowed.

6.5.5.3. This injustice reverberates, a dissonant chord in the harmonious score of meritocracies. The scales of law tilt toward the deserving. The veil shrouding this decision isn't mere

fabric; it's illustrative of deeper biases. Punishment awaits a reprimand for disregard, a recalibration of justice. Justice demands restoration. Let merit reclaim its rightful place. Let the deserving ascend.

## 6.6.  Arguments on the Retaliations and Defamation I Incurred

### 6.6.1.  Introduction

6.6.1.1. In the intricate corridors of bureaucracy, my tenure as a Branch Manager within the Probation and Pretrial System Division (PPSD) unfolded like a tapestry of decisions, each thread meticulously woven to align with my professional responsibilities. Yet, fate conspired against me, casting shadows on my intentions.

6.6.1.2. The Deputy Chief of CMSO, a figure of authority, loomed over my days. Her actions perpetuated a hostile environment, exacerbating my already precarious situation. The air crackled with tension, and the walls seemed to whisper secrets. Her influence weighed heavily, like an oppressive cloud.

6.6.1.3. My decisions, painstakingly crafted, met an unyielding fate. Dismissal, overturning, and invalidation became my companions. Each choice carried the weight of responsibility, yet they crumbled like sandcastles against the tide.

6.6.1.4. Despite my best efforts, the outcomes remained elusive. The scales tipped away from my favor, leaving me grappling with thwarted intentions. Consequences echoed, a haunting refrain. The government's entrusted responsibilities clung to me, unyielding.

6.6.1.5. The weight of duty pressed upon my shoulders. Responsibilities, like Atlas's burden, threatened to crush me. I longed to undo the government's vested trust, to discharge my duties fully. But the labyrinth of bureaucracy held me captive.

6.6.1.6. Five incidents stand out within this narrative, a constellation of tangible evidence. Each is etched in memory, a testament to my struggle. I cannot delve into every detail here, but these moments—like stars in the night sky—beckon for justice. In summary, the corridors of power hold both promise and peril. As a Branch Manager, I navigated the tumult, my footsteps echoing through the annals of bureaucracy.

### 6.6.2. Factual Background

6.6.2.1. The first incident I want to bring to your attention occurred on the 19th day of October 2021. On this day, Mr. Crystal Coleman, from the security team, detected that Ms. Anita Kulkarni, one of the experts who reported to me, logged into the US Courts VPN from India, breaching Chapter 3, Section 330 of the AO Manual, which prohibits employees from taking government property and accessing the US Courts Portal and the US Courts VPN (See Exhibit 9.4 WC Copy of Security Alert VPN login from India - Incident #820341).

6.6.2.2. As this was a serious breach, the security team instantly disabled Ms. Anita Kulkarni's network. Following this notice, when Ms. Anita Kulkarni got back to the USA, I discussed the matter with her, and she avowed that she made the mistake of writing *(Exhibit 9.5 WC Copy of a Letter Acknowledging the Illegal Act Anita by taking Government Property Aboard).* In my unwavering commitment to safeguarding government property and upholding the guidelines outlined in the AO Manual, I meticulously composed a formal letter of reprimand. Addressed to the AOHR department, this missive urged them to initiate appropriate legal measures against the individual identified as Ms. Anita Kulkarni, the perpetrator.

6.6.2.3. Considering the gravity of the situation, my unequivocal recommendation was clear: termination of her employment and further investigation on the matter as nothing was known about why Ms. Anita Kulkarni took government apparats to India while she is well aware of the fact that it is prohibited and after taking it why did she try to connect to US Courts VPN. However, this decision was not to be taken lightly. The stakes were high, and the need for decisive action was paramount. A thorough investigation into the matter was imperative to ensure justice and uphold the organization's integrity.

6.6.2.4. However, I had a lot of pressure from the Deputy Chief of CMSO. Finally, I decided to write a reprimand letter in accordance with the AO Manual, Volume 4: Human Resources, Chapter 13: Employee and Management Relations, § 1360.20 (c) (1) initiating appropriate corrective action to address inappropriate employee conduct, when warranted; The revelation was nothing short of astonishing: my supervisor informed me that the Deputy Chief of CMSO had expressed a desire to bestow incentives upon Ms. Anita Kulkarni, and the reasons behind this decision remained shrouded in mystery. The weight of this situation pressed upon me, as it involved exerting influence and applying pressure to reverse my stance on Ms. Anita Kulkarni's misconduct and legal transgressions. The internal conflict was not only painful and disheartening but also hindered my ability to fulfill my responsibilities.

6.6.2.5. The Deputy Chief's insistence on granting incentives to Ms. Anita Kulkarni left me perplexed, sleepless, and deeply ill-fated. It felt like an affront, an act that not only disregarded my role as a Branch Manager but also insulted my professional integrity.

The emotional toll was immense, and I grappled with the implications of this decision for days on end.

6.6.2.6. The second disconcerting incident that unfolded within the intricate web of workplace dynamics was an act that reeked of retaliation and defamation. In this scenario, the Deputy Chief of CMSO wielded her authority with a heavy hand, unlawfully redirecting the experts who reported to me. She instructed them to report directly to her instead of following the established chain of command. Among the myriad instances that unfolded during my tenure, one stands out: a disconcerting act reverberating through our professional environment's corridors. Ms. Cherise Coutinho, a project manager under my purview, held the reins of an application known as PACTS.

6.6.2.7. However, in a surprising twist, I found myself excluded from the reporting chain. Instead of adhering to the established hierarchy, Ms. Cherise Coutinho began reporting directly to the Deputy Chief of CMSO, effectively severing the link in the command structure *(See Exhibit 9.7 WC Copy of a Document Attesting the Interference of the Deputy Chief and My Subordinate reported to Deputy Chief)*. The implications were profound; not only did this breach undermine my role as her immediate supervisor, but it also cast a shadow on my professional integrity.

6.6.2.8. The precedent set by such an overruling of subordinate management left me grappling with the weight of its consequences, sleepless nights, emotional distress, and a sense of professional insult gnawing at my resolve as I navigated the murky waters of workplace politics *(See Exhibit 9.7 WC Copy of a Document Attesting the Interference of the Deputy Chief and My Subordinate reported to Deputy Chief)*. The third incident was a sort of intricate layer of this disconcerting narrative. Ms. Cherise Coutinho, though not

a permanent government employee, found herself in a trial period, a transition from a contract worker on W2 to a full-time government staff member.

6.6.2.9.However, her performance, professional ethics, and skill set fell short of the mark expected for a project manager role, which inherently demands technical acumen in software development. As her supervisor, I wrestled with the weighty choice of elevating her to a full-time government role. Despite my sincere endeavors to steer her toward professional development and foster her commitment to the job, she regrettably fell short of aligning with her responsibilities.

6.6.2.10.    Consequently, I recommended the termination of her temporary job agreement in due time, advocating for recruiting a more suitable professional. This suggestion, however, became a political battleground, and she was swiftly relocated to another team. Subsequently, in her new team, Ms. Cherise Coutinho faced a different fate; her performance fell short again, leading to her termination in the fall of 2023.

6.6.2.11.    It's worth noting that when I initially proposed the idea of termination, it was met with resistance, the reasons for which remained obscure to me. However, when the same recommendation emanated from another supervisor, it was swiftly accepted and enforced. The disparity in treatment left me perplexed, questioning the dynamics at play and the impact on my professional standing. The Deputy Chief's consistent disregard for my counsel and the frequent reversal of my decisions inflicted a profound emotional toll. It felt as though my career in the software industry was unraveling before my eyes, a painful realization that left me sleepless, disheartened, and questioning my professional standing.

6.6.2.12.   The fourth incident transpired amidst the intricate tapestry of my professional

journey, and I found myself ensnared in a web of false allegations and defamatory

whispers. Within the office corridors, gossip swirled, casting me as a stern, unfriendly

figure, a man perceived to be at odds with women. One particular incident stands out: a

client, emboldened by this office chatter, lodged a complaint against me. The

accusation painted me as disrespectful, ill-mannered, and rude during a meeting I had

conducted.

6.6.2.13.   The Deputy Chief, seizing upon this complaint, escalated it to the Deputy Chief,

who summoned me to a meeting on 03/04/2022 (*Exhibit 9.16 WC Copy of Meeting

Minutes to a Special Meeting*). There, the Deputy Chief and the customer stood united

in the harsh glare of scrutiny.

6.6.2.14.   The then CMSO Chief and his vice, their expressions critical and reproachful,

seemed impervious to my pleas for a fair hearing. The weight of their judgment left me

feeling voiceless, stripped of my right to be heard, a man adrift in a sea of professional

injustice.  Amidst the intricate tapestry of my professional journey, I found myself

ensnared in a web of false allegations and defamatory whispers. Within the office

corridors, gossip swirled, casting me as a stern, unfriendly figure, a man perceived to be

at odds with women.

6.6.2.15.   One particular incident stands out: a client, emboldened by this office chatter,

lodged a complaint against me. The accusation painted me as disrespectful, ill-

mannered, and rude during a meeting I had conducted. The Deputy Chief, seizing upon

this complaint, escalated it to the Chief, who summoned me to a meeting on

03/04/2022. There, the Deputy Chief and the customer stood united in the harsh glare

of scrutiny. The Chief and his vice, their expressions critical and reproachful, seemed impervious to my pleas for a fair hearing.

6.6.2.16.    However, I asked to prove the issue beyond a reasonable doubt; no one was willing to listen to me. The weight of their judgment left me feeling voiceless, stripped of my right to be heard, a man adrift in a sea of professional injustice. I felt ashamed of myself for not being seen as even a man with the right to be heard. The emotional toll was immense, gnawing at my resolve, and I grappled with the implications of this ordeal for days on end.

6.6.2.17.    The fifth incident was subjected to false allegations and defamations. There were times when gossip was going around the office, and I was leveled as a man against women, unfriendly, and very strict. Following such office gossip, one of the customers I work with complained to the Deputy Chief, passing my immediate supervisor, the Division Chief. The allegation was that I was disrespectful, bad-mannered, and rude to my client in a meeting I was conducting.

6.6.2.18.    In the intricate web of office dynamics, a pivotal moment unfolded: a summons to the Chief's chamber. The date etched in memory is March 4, 2022. As I stepped into that hallowed space, the air thickened with tension. The Deputy Chief, like a chess player maneuvering her pieces, had escalated the matter. Her intentions remained veiled, but the stakes were high. The Chief awaited an enigma wrapped in authority.

6.6.2.19.    The room exuded formality. Mahogany panels framed the walls, and the Chief's desk stood as an altar of judgment. The Deputy, her expression inscrutable, sat across from me. Her eyes bore into mine, a silent challenge.

6.6.2.20.    The Chief, flanked by his vice, presided. Their demeanor? Critical, reproving, accusatorial. Their words cut like shards of glass. Each syllable dissected my intentions, leaving me exposed. I dared to speak, a desperate plea for fairness. "Prove the issue beyond reasonable doubt," I implored. But the Chief's ears were sealed. He dismissed my words as if they were mere echoes in a cavern. Shame clung to me, a heavy shroud, not as a professional, but as a man denied the right to be heard. The room blurred, and I wondered: Do my footsteps matter in this labyrinth of power?

6.6.2.21.    In summary, the Chief's unwillingness to listen reverberated, a dissonance in the symphony of justice. All said, in the intricate tapestry of my professional journey, one instance stands out: a persistent ache that gnaws at my resolve. It revolves around the act of dismissing, ignoring, and neglecting my professional competence and expertise. This disheartening pattern emerges most prominently when I express my opinions regarding highly intricate, expensive, and unpredictable initiatives overseen by the Deputy Chief.

6.6.2.22.    For instance, I proposed the creation of an application to manage the comprehensive training conducted by AO at the enterprise level. Enterprise Training System (ETS), as I named it, was meticulously outlined in a concept note. In the crucible of our collective effort, my team and I toiled ceaselessly over the draft architecture and meticulous specifications. With bated breath, we unveiled our proposal before the Deputy Chief, hoping for the nod of approval. The project met an abrupt demise, devoid of any substantive rationale. My painstakingly crafted inputs, fortified by seasoned professional wisdom, echoed into a void, unheard and unheeded.

6.6.2.23.    What is more, within the labyrinth of ongoing projects, some applications have languished under construction for years. Despite my expertise, my professional comments and recommendations have been consistently disregarded. One such instance involves a modernization effort fraught with structural issues, both in process and product development. Collaborating with my team, I highlighted these flaws. Yet, my input remains unrecognized, overshadowed by a narrative propagated against me. The insinuation is that I am rude and unfriendly to the experts working diligently on this endeavor.

6.6.2.24.    The last but most aching instance I want to mention is the act of dismissing, ignoring, and/or neglecting my professional competence and expertise, especially when I express my opinions about highly intricate, expensive, and unpredictable initiatives managed under the leadership of the Deputy Chief. For instance, I suggested building an application that would handle the training that AO conducts at the enterprise level.

6.6.2.25.    I named this application ETS (Enterprise Training System). I, along with my team, drafted the concept note, worked on a draft architecture and some specifications, and brought them to the attention of the Deputy Chief for approval. Without ado, the project was dismissed for no sound or convincing reason.

6.6.2.26.    My input and professional comments have been disregarded on some of the struggling applications that have been under construction for years now. For instance, in collaboration with my team, I made a professional comment on one of the most struggling modernization efforts, which has a structural issue both in the process and product development endeavor.

6.6.2.27.    My input is not yet recognized. Nevertheless, it was used to propagate as if I was rude and unfriendly to the experts working on it. These are just a few examples of the multiple instances of retaliation and defamation which have caused me to suffer inside out.  In a succinct summary, my professional journey has been marred by a series of distressing incidents. First and foremost, there was the unwarranted interference, an audacious assumption of control during my meetings without my consent.

6.6.2.28.    This usurpation led to potential ridicule from participants who, ironically, were under my guidance and support. The details of these unsettling encounters will be meticulously outlined later in this document. Adding to the mounting pressure, I found myself ensnared in a web of baseless accusations and defamation. Colleagues, perhaps fueled by office gossip, collaborated to submit complaints against me to the hiring manager. These allegations ranged from disrespect to ill-mannered conduct during client meetings.

6.6.2.29.    However, none of these charges were substantiated by concrete evidence, and my guilt remained unproven beyond a reasonable doubt. Yet, despite the lack of validation, I bore the brunt of slander and defamation. Verbal warnings and rebukes were unjustly heaped upon me, leaving me disheartened and questioning my place within the organization. The emotional toll was immense, and I grappled with the implications of these ordeals for days on end.

6.6.3. **Legal Arguments on the Damages I Incurred**

6.6.3.1. Because of these retaliatory actions, I have endured the following distressing effects:

6.6.3.1.1.   The tempest of defamation has swept through the citadel of my career, a relentless assault that razed the edifice I painstakingly erected over the years. The echoes of

false accusations reverberate, their insidious tendrils strangling my confidence. Once voracious in my reading habits, I now tread the parched terrain of neglect. The scaffolding of my profession, once sturdy, now crumbles under the weight of doubt.

6.6.3.1.2. My respect, once a beacon guiding my path, now flickers in the gathering shadows. The tapestry of professional acceptance, woven with threads of trust and recognition, unravels. The toll exacted by this character assassination is immeasurable, a ledger of intangible losses etched in anguish. And so, I stand before the scales of justice, demanding $2 million, not merely as compensation for the material cost but as a plea for the restoration of honor and the rekindling of my shattered spirit.

6.6.3.1.3. The sanctum of my serenity lies in ruins, shattered like delicate glass. Restlessness, an insatiable beast, gnaws at my core, stealing the solace of slumber. A pervasive cloak of hopelessness drapes my existence, casting shadows upon every thought and moment. The toll exacted for this ceaseless struggle between unrest and tranquility amounts to a staggering $1 million. Within the fragile vessel of my health, I bear the weight of affliction. My existence is a tempest of soaring blood pressure, each heartbeat reverberating with the strain within.

6.6.3.1.4. Once tranquil rivers, my veins now surge with urgent currents, their calm disrupted. Elevated blood sugar levels weave a tangled web, ensnaring my vitality. The sweet taste of life has dulled, replaced by a bitter aftertaste that lingers. My appetite, once an eager companion, has forsaken me, leaving behind a hunger unfulfilled.

6.6.3.1.5. The erosion of my inner tranquility has cast a shadow over the tapestry of my life, leaving frayed threads where once there was harmony. But this dissonance

reverberates not only within myself; it echoes through the delicate bonds of my relationships. These trials have exacted a toll, and I believe a significant portion of my life has been deducted due to this suffering. Therefore, I earnestly request $1.3 million in compensation and restitution for the years lost to this relentless battle within my body.

6.6.3.1.6.  In the symphony of our shared existence, my wife, who once danced to the familiar cadence of my heart, now bears witness to its irregular beats, the rhythm disrupted by uncertainty and unrest. Her eyes, once reflecting our intertwined dreams, now mirror concern and bewilderment. Our only daughter, the embodiment of hope and promise, has keenly observed my emotional landscape shift. She gazes upon a father who withdraws, his laughter muted and his embrace distant.

6.6.3.1.7.  The innocence of her youth grapples with the weight of my emotional detachment, a burden she should never bear. In the name of lost peace, I stand resolute, demanding $1.5 million as compensation for the fractured bonds with my wife and our precious daughter. Relatives and friends, those steadfast pillars of support, now find themselves startled and bewildered. They witness my gradual retreat from conversations and my reluctance to engage. Their surprise intertwines with genuine concern, creating a bittersweet blend of compassion and confusion.

6.6.3.1.8.  These adverse consequences ripple outward, akin to stones dropped into a still pond. But the toll extends beyond the personal, and it resonates through the intricate web of human connection. My well-being bears the scars of these strained bonds. The threads that once bound us now fray, and I grapple with the aching unraveling of those ties. Considering this emotional toll, I assert my demand for $ 2 million in

compensation and restitution for the profound loss sustained in terms of my relationships with family, relatives, and friends.

6.6.3.1.9. The ledger of my missed opportunities, a tapestry woven with threads of payments, benefits, and unrecovered reimbursements, unfurls before me. The Deputy Chief position, once tantalizingly close, now stands as a phantom limb, a void where prosperity should have thrived. The cost extends beyond mere currency; it exacts a toll on energy, time, and the currency of resilience.

6.6.3.1.10. In pursuit of justice, I navigated treacherous currents, each ripple echoing the weight of my endeavor. Legal battles waged, resources depleted, and sleepless nights etched lines upon my weary face. The ledger, meticulously tallied, reveals a staggering sum: $ 1.5 million, restitution for the life diverted, the dreams deferred, and the relentless pursuit of vindication.

6.6.3.1.11. And thus, I lay forth my demand: a staggering sum of $8.3 million, not as a mere monetary plea but as an unwavering assertion of the intangible losses, the shards of self-scattered like coins into the abyss. I am acutely aware that this monetary figure pales in comparison to the richness of what I've lost: my health, my peace of mind, the once-vibrant hues of pleasure and delight, and the respect and dignity that adorned me as a seasoned professional and a senior citizen.

6.6.3.1.12. Yet, this claim transcends mere currency. It is a clarion call for justice, an insistence that the scales be balanced, that the echoes of consequence reverberate through the corridors of those responsible. Justice, like a delicate balance, teeters. The scales must be recalibrated. The echoes of consequence, like ripples in a pond, demand recognition. The trio stands accused, the government, a behemoth; the remaining two

are mere mortals. Their shares must be apportioned: the government claiming its maximum, the others bearing the rest.

6.6.3.1.13. Let this sum serve as a stark reminder, a testament to the fragility of honor, the weight of accountability, and the indomitable spirit that seeks redress even when the odds are insurmountable.

### 6.6.4. Conclusion

6.6.4.1. In the shadow of adversity, I stand resolute, my spirit unyielding. The echoes of discrimination reverberate through the corridors of my professional journey, leaving scars etched upon my soul. My accomplishments, painstakingly woven over the years, now lie trampled, their brilliance obscured by the murky fog of bias.

6.6.4.2. My career, once a beacon of promise, now flickers in the tempest. The essence of my being, the tapestry of my social character, has been marred, its vibrant threads frayed by injustice. I am no longer the architect of my fate; instead, I am ensnared in a web of malevolence.

6.6.4.3. The toll on my health is palpable, a silent symphony of anguish. Each heartbeat bears witness to the weight of emotional distress, a relentless predator gnawing at my resilience. Hope, once a steadfast companion, now flutters like a wounded bird, seeking refuge beyond the horizon.

6.6.4.4. Yet, within this darkness, a spark persists in quiet defiance. I shall not surrender to despair. For every bruised dream, I forge anew. My voice, a clarion call, reverberates across courtrooms and hearts alike. In seeking justice, I reclaim my shattered purpose, stitching together the fragments of hope that remain. As the gavel falls, may it echo not only through the hallowed halls of justice but also through the corridors of empathy.

## 7. Legal Precedents

### 7.1.1. Legal Precedents on National Origin and Age Discrimination Cases

7.1.1.1. In March 2020, a federal jury in New York awarded $6 million to a former employee of a U-Haul company who claimed he was discriminated against and harassed because of his Iranian origin and age.

7.1.1.2. In December 2018, a federal jury in New Jersey awarded $6 million to a former employee of a pharmaceutical company who claimed he was discriminated against and terminated because of his Indian origin and age.

7.1.1.3. In February 2021, a federal jury in Texas awarded $5.3 million to a former employee of a hospital who claimed he was discriminated against and retaliated against because of his Nigerian origin and age.

7.1.1.4. In October 2019, the EEOC obtained a $1.5 million consent decree to resolve a national origin and age discrimination lawsuit against a California-based staffing company. The EEOC alleged that the company discriminated against older, non-Hispanic applicants by favoring younger, Hispanic applicants for agricultural jobs.

7.1.1.5. In August 2019, a federal jury in Florida awarded $1.3 million to a former employee of a healthcare company who claimed he was discriminated against and fired because of his Cuban origin and age.

7.1.1.6. In June 2019, the EEOC secured a $1.2 million consent decree to settle a national origin and age discrimination lawsuit against a New York-based food distributor. The EEOC claimed that the company discriminated against older, non-Hispanic workers by subjecting them to harsher discipline, denying them promotions, and terminating them.

7.1.1.7. In January 2020, the EEOC settled a race and national origin discrimination case against a Nevada U-Haul company for $153,000. The EEOC had charged that the company subjected Hispanic and Asian/Filipino employees to derogatory comments and slurs based on their race and/or national origin.

7.1.1.8. The Espinoza v. Farah Manufacturing Co. case is significant in the context of national origin discrimination. It established that such discrimination encompasses various aspects, including ethnicity, language, and cultural characteristics. This landmark verdict reinforces the importance of addressing bias and promoting equality in the workplace. If you have any further questions or need additional information, feel free to ask.

7.1.1.9. In the EEOC v. Arabian American Oil Co. (ARAMCO) case, it was established that Title VII does not apply extraterritorially to regulate the employment practices of United States firms that employ American citizens abroad. The verdict clarified that Title VII does not cover employment discrimination claims by U.S. citizens working abroad for American employers. It remains an essential precedent in understanding the scope of Title VII in international contexts.

7.1.1.10.      In the Hazen Paper Co. v. Biggins case, the central issue was age discrimination under the Age Discrimination in Employment Act (ADEA). The verdict clarified that an employer's decision to terminate an employee based on pension eligibility does not violate the ADEA. The Court held that the ADEA does not prohibit employers from considering pension status or eligibility when making employment decisions. As a result, the plaintiff, Biggins, did not receive compensation, and the case

remains significant in understanding the interplay between age, pensions, and employment decisions.

7.1.1.11.     In the Gross v. FBL Financial Services, Inc. case, the central issue revolved around age discrimination under the Age Discrimination in Employment Act (ADEA). The verdict clarified that a plaintiff bringing an ADEA disparate-treatment claim must prove that age was the "but-for" cause of the adverse employment action. Unlike Title VII, the ADEA does not require the burden to shift to the employer to show that the action would have occurred regardless of age. This precedent remains essential in understanding age discrimination claims in the workplace.

7.1.2.   **Legal Precedents on Retaliation and Defamation Cases**

7.1.2.1. In the case of Watson v. McDonough, the plaintiff alleged race discrimination, retaliation, constructive discharge, and a hostile work environment during her employment at the Kansas City VA. However, the Eighth Circuit affirmed the district court's grant of summary judgment in favor of the VA. The court concluded that the plaintiff failed to establish a prima facie case of race discrimination, hostile work environment, retaliation, or constructive discharge. Notably, many incidents she presented as adverse employment actions did not meet the criteria for Title VII.

7.1.2.2. In Ackerman v. Iowa, Susan Ackerman, a former employee of Iowa Workforce Development (Workforce Development), brought forth claims of retaliation, defamation, and intentional infliction of emotional distress against her former employer, the state of Iowa, as well as certain former supervisors and coworkers.

7.1.2.3. The allegations stemmed from her termination as an Administrative Law Judge (ALJ) based on accusations of fraudulent insurance enrollment forms and falsification of her daughter's marital status. The court ruled in favor of the defendants, concluding that Ackerman failed to establish a constitutional violation related to First Amendment retaliation. Additionally, the court found that the defendants' conduct did not meet the threshold for the Iowa tort of intentional infliction of emotional distress.

7.1.2.4. Donald Trump faced a legal setback of $83.3 million in the E. Jean Carroll defamation case in 2023. A jury ruled in favor of Carroll, who accused Trump of defaming her in 2019 when he denied her sexual assault allegations while serving as president. The verdict builds upon a previous $5 million judgment Carroll won against him in May 2023. Trump's appeal efforts have been unsuccessful, and he now faces significant financial pressure due to multiple court judgments. If you'd like more details, please explore the news articles on this case.

## 8. Requested Action

8.1.1. I am actively seeking equitable treatment, appropriate compensation for the harm I've endured, and formal recognition of the discrimination and retaliation I have experienced.

## 9. Conclusion

9.1.1. I firmly assert that the discriminatory treatment I experienced infringes upon my rights under relevant anti-discrimination laws. Despite my impressive qualifications, extensive experience, and stellar performance, the decision to favor Ms. Vijayalakshumi was unjust and discriminatory. Throughout the employment process, I encountered instances of discrimination, which have significantly harmed me as a US citizen. As a result, I am resolutely seeking justice and redress.

9.1.2.    Moreover, the aftermath of the hiring process was marked by retaliation on multiple occasions. It is disheartening to witness my colleague, Ms. Vijayalakshumi, being given preferential treatment despite being less educated, less competent, and less experienced. This situation underscores the critical importance of addressing discrimination and ensuring fair treatment for all individuals in the workplace.

9.1.3.    The disheartening reality unfolds as my colleague, Ms. Vijayalakshumi, receives preferential treatment over me. She stands in the spotlight despite her limited education, questionable competence, and lack of experience. This scenario serves as a stark reminder of the need to combat discrimination and uphold fairness for every individual within the workplace.

9.1.4.    In summary, the imperative of advocating for equal opportunities and combating discrimination should resonate with all stakeholders involved. These perpetrators, whether managers, colleagues, or organizational leaders, are responsible for fostering a just and equitable work environment. Their actions reverberate beyond individual decisions; they shape the fabric of workplace culture.

9.1.5.    Moreover, it is essential to recognize that discriminatory practices are not isolated incidents. They often manifest in rotatory actions, perpetuating bias and inequity. To rectify this, penalties and comprehensive measures must be implemented. Only then can we truly pave the way toward a workplace where merit, competence, performance, experience, fairness, and inclusivity prevail.

Sincerely,

Wodajeneh Cherinet